The opinion of the court was delivered by
Watkins, J.
-.This suit involves a question of settlement growing out of a transaction between the plaintiff and defendant in regard to a matter of the City Floating Debt, which is funded in the city four per cent, bonds under Article 313 of the Constitution of 1898.
The plaintiff' claims of the defendant the sum of three thousand, four hundred and sixty-eight dollars and thirty-five cents, with legal interest from judicial demand; and, on the other hand, the defendant denies any indebtedness to the plaintiff whatever.
The cause was submitted to and tried by a jury, who rendered a verdict in favor of the defendant; and, after an unavailing effort to obtain a new trial in the lower court, judgment was rendered in favor of the defendant; and the plaintiff prosecutes an appeal therefrom.
The substantial allegations of the plaintiff’s petition are as follows:
*1968 That in the early part of April, 1898, petitioner made a contract, or agreement with the defendant, by which certain floating indebtedness of the City of New Orleans commonly termed “scrip,” was to be purchased for their joint account; the funds necessary therefor to be furnished and supplied by 'the defendant — petitioner believing, and so informed defendant, that some provision would be made in the Constitution for its liquidation and settlement. That prior to, and at the time of the making of said contract or ag’veement, the commuttee on city affairs of the convention had under consideration a scheme by which said floating indebtedness for the years from 1879 to 1895, inclusive, was to be paid and retired; that petitioner having appeared as counsel before said committee in behalf of cetrain floating, debt creditors of the city for said years, of which defendant was not one, and on sufficient reasons, believing that the said committee would report favorably on said scheme, and that said action would favorably effect the value of said floating indebtedness 'and cause an advance in the price of same, he was-influenced to propose to the defendant the contract aforesaid.
Petitioner avers that said contract was entered into and completed before the committee had made its report; and that, thereafter, the report of said committee was in due course laid before the convention, adopted and incorporated into the Constitution.
The petition then relates:
“That the^contract and agreement so made as aforesaid by petitioner and the said defendant was for the purpose, and subsequent obtaining of the payment of, certain floating indebtedness of the City of New Orleans for certain years between 1879 and 1895, inclusive, aggregating cn its face $36,015.74, of which $8,469.37 was owned by the firm of Sulzbacher & Company, and the remainder of $27,546.37 by Perrier Ereres — both partnerships domiciled and carrying on business in the Republic of France; that the said scrip, or indebtedness of the latter, was in the possession of Stephen Chalaron, and the former in the possession of Lehman, Stern & Company, or of Maurice Stern, as agents of the owners respectively; that it was understood and agreed between petitioner and the said Newman, as part of the said contract and agreement, that the latter was to advance the funds necessary to acquire said scrip, be allowed interest thereon, and that the profit made upon the transaction, that is to say, the difference between, the sum for which the *1969 .said indebtedness or scrip would be thereafter cancelled and returned, under the then anticipated provision of the Constitution and the price which was paid for the same, with interest added, should be divided between the said Newman and your petitioner, in the proportions of two-thirds to the former, and one-third to the latter.
“That pursuant to the said contract and agreement, and in part execution thereof, the said Newman did purchase and acquire, for the purposes of said contract, the said indebtedness or scrip from the said Perrier Bros., and Sulzbacher & Company, through their aforesaid .•agents, respectively; that subsequently, the said committee on city •affairs having made to said convention a report and recommendation of ¡a plan or scheme to retire the floating indebtedness of the City of New Orleans, from 1879 to 1895, inclusive, which said plan or scheme is the same in terms as that now incorporated into the Constitution of 1898, as Article 313 thereof, and the Board of Liquidation of the City Debt having proceeded to the discharge of the duties by said Article 313 imposed upon it, the said Newman, in whose name alone the said scrip had been acquired, but for the purpose of carrying- out and executing his said contract with petitioner, offered the said scrip for sale to the 'City of New Orleans, through the said Board, at sixty-eight cents on the dollar; that his proposal was accepted for all of said scrip that he .acquired from Perrier Brothers, as well as that acquired from Sulzbacher & Company and accordingly, he was paid by said Board, and received as the purchase price of all of said scrip the sum of $24,490.60. 'That he had paid as the purchase price of said scrip to the said Perrier Brothers, and Sulzbacher & Company, thirty cents on the ■dollar of its face value, the aggregate price amounting to $10,804.72; which resulted in a margin of profit, or excess of the price received over the price paid as aforesaid, of $13,665.88, of which petitioner, •under his contract aforesaid, was entitled to one-third, or $4,555.29.”
Petitioner avers, that, subsequently to-wit, on March 9, 1899, the •defendant rendered to him a statement, purporting to be an account of the transaction conducted by him for the purchase of scrip formerly held by Sulzbacher & Company, and the collection of the same from the Poard of Liquidation — said statement showing a profit of $3,349.79, which, on its face, appeared to belong to petitioner, exclusively, in which petitioner in fact had not so large an interest.
IV.titioner alleges that said statement was not true and correct, in the •following particulars:
*1970 1. That it omitted any reference concerning the Perrier Ereresscrip, which, at the date of said statement, had been closed and completed and concerning which petitioner was entitled!' to an accounting..
2. That petitioner was not entitled, as shown by said statement, to the entire profit thereby exhibited, to-wit, the sum of $3,349.77, but only to one-third thereof, in accordance with the contract hereinbefore set out.
3. That said statement is false in reciting that said defendant had purchased certain script from petitioner.
4. That the date given in said statement as the one upon which the Sulzbacher scrip was purchased, as April 12th, 1898, is not correct, said purchase having been made prior to the report of said committee on city affairs of the Constitutional Convention, of date April 12, 1898-
Petitioner then alleges, that said statement was evidently intended to> conceal the true relations between himself and defendant; and that same was done for some purpose not disclosed and unknown to petitioner at the time.
He further represents, that the defendant, at variance with his own. statement of March 6th, 1899, and under which petitioner would have been entitled to receive $3,349.77, paid over to petitioner only $1,116.59, being one-third of said amount; and, furthermore, as a condition of said payment, exacted from petitioner a receipt for the same, which was not in accordance with the statement, in the respect that it recited! and declared that the said $1,116.59, was the full payment and settlement of “all services, claims and demands growing out of the matter of the city floating debt, funded into city four per cent, bonds under' Article 313' of the Constitution of 1898;” and also that it contained a-relinquishment by petitioner in favor of said defendant of all of his; right, title and interest, declaring said payment of $1,116.59 to be in; full settlement of all of petitioner’s interest “in the said affair.”
That said document did not contain a true statement of the facts to which it refers, in these particulars; that it was not in full payment and settlement of all of petitioner’s claims and demands growing out of the-matter mentioned, for the reason that it did not include the transaction concerning the scrip purchased from Perrier Ereres, and did include the relinquishment of all of petitioner’s right, title and interest; and the-declaration of said receipt as a full settlement, could in no event, apply to said transaction, concerning the Perrier scrip, and would be,. *1971 at all times, and under all conditions, restricted in its effect to-the transaction concerning the Sulzbaeher scrip, which alone appeared on the statement of March 6, 1899; and in settlement of which the said $1,116.59 was paid.
“That in signing said receipt, petitioner did not intend to relinquish any right which he had under his contract with said Newman, appertaining to, or growing out of the purchase of scrip from Perrier Ereres, or to release the said Newman from any sum he might owe petitioner on that account; that petitioner signed said retceipt simply to obtain the fruits of his contract so far as concerned said Sulzbaeher scrip and for no other purpose; that said receipt was prepared by ski'd Newman for petitioner’s signature, and upon which he insisted, as a condition precedent to his paying the said sum of $1,116.59. That said receipt is more fully shown by reference to a copy hereof, annexed and made a .part hereof, as exhibit C; and your petitioner insists that said receipt is open to explanation dehors its terms; and by which petitioner will show that said receipt furnishes no bar or impediment to his recovering from said Newman his share of the profits realized in the transaction concerning the Perrier scrip as aforesaid.”
The petition then relates the circumstances, dates and purport of certain correspondence which took place between the parties, with reference to said settlement and receipt, all of which are annexed to and made part of the petition, for reference.
The answer of the defendant denies all and singular the facts and allegations contained in the plaintiff’s petition, except such as may be admitted.
It specially denies that defendant made any contract or agreement of any kind with the plaintiff touching the purchase of the scrip referred to as the Perrier Ereres scrip; but, on the contrary, that said scrip was owned by defendant and under his control at the time of the first conversation with the plaintiff; “and said scrip was specifically excepted from any arrangement made between the parties.”
“Eor further answer, respondent denies that any agreement whatever was made concerning the conversation of the plaintiff on the matter of the Sulzbaeher Brothers’ scrip, but respondent allowed him the same compensation that he allowed on two other matters subsequently brought to him by the plaintiff.
“Respondent avers that the statement furnished the plaintiff was a *1972 full and final account of all matters between them; and that the receipt which was taken was intended to cover all transactions of every nature and kind growing out of the said scrip; and was framed in language which left no doubt of that proposition, because previous to the execution of said receipt, the said plaintiff had brought up the question of this Perrier Freres scrip, and had been informed by respondent, that he had no interest whatever therein; -and that it was a violation of his agreement to claim such; that the payment made was made after due and thorough understanding of the situation.”
Wherefore respondent prays that plaintiff’s demand be rejected.
From the foreging answer, it will be observed, that the denial of the defendant of the plaintiff’s demand, is chiefly restricted to the matter of the purchase of the Perrier Freres scrip; and that denial is coupled with the statement that, “on the contrary, said scrip was owned by respondent, and under his control at the time of the first conversation with the plaintiff.”
And, then, the further express declaration is made that “said scrip was specifically excepted from any arrangement made between the parties.”
The answer, while disavowing any specific agreement having been made by the plaintiff concerning the amount of compensation he was to be paid on the transaction of the Sulzbacher Brothers scrip, admits having allowed him the same compensation as that which he had allowed him in two other matters subsequently — that is to say, one-third of the profits.
The chief matter in controversy is that which arises on thel face of the receipt; defendant’s contention being “that the receipt which was taken, was intended to cover all transactions of every nature and kind growing out of said scrip, and was framed in language which left no doubt of that proposition;” the additional statement being made that the question of the purchase of the Perrier Freres scrip was broached and discussed between them before the receipt was -executed.
The best method of stating the respective claims of the parties will be to recapitulate the various documents and letters to which reference Fas been made; and then apply the parol evidence which the record affords.
*1973 “A. 1.”
“Established 1868.
“Isidore Newman, Sr.,
“Ranker & Broker.
“P. O. Box .117.
New Orleans, August 8, 1898.
“City time.
$8,469 37
4,784 63
16,288 17
1,507 37
2,574 50
2,391 70 —$36,015 74’r
“B. 1.”
“Established 1868.
“Isidore Newman. Sr.,
“Banker & Broker.
“P. O. Box 117.
“New Orleans, March 6th, 1899.
“17. L. Lazarus, Esq.,
Statement of
“City Floating Debt.
“(Funded into 4 per Cent, bonds, under Ordinance 313 of the Constitution of Louisiana of 1898).
“1898.
“October 31, $8,469.37 funded into floating debt 4 per cent bonds at .68................................ $5,759 17
“1899.
“March 6, $1,754.96 funded into floating debt 4 per cent. bonds at .68..................................... 1,193 37
“1898.
“April 12, $8,469.37 purchased from Lehman, Stern & Co., at .30......................$2,540 81
“Interest from April 12, 1898, to October 31st, 1898, 203 das. at 8 p. an............ 114 60
*1974 “September 20, $1,498.70 purchased from IT. L.' Lazarus ................................ 752 50
“Interest from September 20th, 1898, to
“date, 168 das. at 8 per cent. p. an........ 28 09
“1899.
“January 30, Additional payment............ 165 45
“Interest from January 30th, 1899, to date,
“36 das. at 8 per cent. p. an.............. 1 32 —3,602 77
$3,349 77”
“E. & O. E.”
“C. 1.”
RECEIPT OE H. L. LAZARUS.
“Established 1868.
“Isidore Newman, Sr.,
“Banker & Broker.
“P. O. Box 117.
“ New Orleans, March 9th, 1899.
“ Received from Isidore Newman, Sr., eleven hundred and sixteen 59-100 dollars, in full payment and settlement of • all services, claims and demands growing out of the matter of the City Floating Debt, funded into' city 4 per cent, bonds under Article 313 of the Constitution of 1898.
“ I relinquish in his favor all my right, title and interest, declaring this to be a full settlement of all my interest in the said affair. $1,116.59.
“ (Signed) Henry L. Lazarus."
“D. 1.”
Letter Written by Jlaintiff to Dependant, March 11th, 1899.
" Isidore Newman, Esq., City:
“Dear Sir: — When I approached you, in the early part of April, 1898, with reference to the purchase of city scrip, you informed me that at the time you had none. I then advised you of the progress I had made in the advocacy of the ordinance before the Constitutional Convention, looking to. the adjustment of tlie floating indebtedness of the *1975 city. I advised you, although you may have had previous knowledge of the fact, that there was a large block of scrip held by Perrier Ereres, 'through their representative, Chalaron, and that Sulzbacher & Co., also held a quantity of the scrip through their representative, Maurice Stern; that the scrip could be purchased, I believed, at a reasonable figure ; and that, if the ordinance was successfully passed through the Convention, it would pay from 65 to 70 cents on the dollar. The arrangement between us was that if I contributed one-half of the money to make the purchase, I was to get one-half of the resulting benefits, in the event the floating indebtedness was adjusted; or, if you advanced the money, you would charge interest on the advance, and allow me one-third. This, conversation was held between ourselves; and of the fact L had nó proof except my statement.
“ You purchased the Stern scrip, and on the same day, as you informed me, or the succeeding day, you purchased the Perrier scrip, both purchases being made through cable messages.
“ I never exacted any writing from you, and was in a measure content to rest upon your word. Roth lots of scrip having been funded, about two weeks ago I called on you, when, for the first time, you informed me that I was not interested in the scrip purchased from Chalaron, known as the Perrier scrip, but was entitled to a share, as agreed upon, in the Sulzbachpr scrip, purchased from Stern. This conversation took place in your office, and in the presence of no one. In order to make good the proof of the fact that such was the contract, while I mildly insisted that the Union Bank scrip was embodied in our agreement, you affirming with repeated asseverations that it was not, I left you to make up a statement of the Stem scrip, so as to enable me to make proof of the fact that our agreement was for one-third of the benefits of the scrip purchased under our previous agreement. I have from your office a memorandum showing not only the Stern scrip held by you, but also the particular scrip purchased from Perrier Ereres through Chalaron; and your action in having prepared and drawn up a receipt which you thought would shut me off from making a claim for my interest in the Perrier scrip, instead of being a protection to you, emphasizes the fact that you know that you owed me a share in that scrip, and attempted to bar me from its recovery. As your lawyer will tell you, a receipt is open to explanations; and as the Perrier scrip has not been accounted for, I claim my interest therein. You certainly bought none of that *1976 scrip prior to the conversation I had with you; and your books as well as the cablegrams and correspondence with Chalaron will show the fact. The agreement as to my percentage is made perfectly plain and clear by your account to me, allowing me one-third, and the payment thereof by your check on the Union Bank.
“ I should dislike very much to have any controversy with you in reference to this matter; and I am anxious that' you should reconsider your action, and the conclusion you have reached, and avoid any friction between usl We made efforts to purchase other scrip, but did not succeed; and I called your attention to matters which you had entirely forgotten, and whereby you were benefited to the extent of upward of' $2,000.00. For this I make no claim, as it was not embraced in oúr contract; but I do insist upon my quota under our agreement, and which I now stand ready and prepared to prove upon your settlement with me of the Stern scrip, and the statement from your office showing tire scrip you purchased from the Union Bank.
“ Tours very respectfully,
“ (Signed) Henry L. Lazarus,”'
“E. 1.”
Defendant's Reply.
" Isidore Newman, Sr.,
“ Banker & Broker,
“ Lock Box 117.
“ New Orleans, March 14th, 1899.
“ Mr. H. L. Lazarus,
Present :
. “ Dear Sir,: — Tour of the 11th inst. is received., I .can only reiterate my previous statement. I do not consider you entitled to a cent more than I paid you.
“ I ¿m not in the habit of disputing my promises, and nothing is clearer than your error in the matter.
“ Tours truly,
“Isidore Newman, Sr.”
*1977 “E. 1.”
Plaintiff's Reply.
“ Mar. 17th, 1899.
“ Isidore Newman, Esq., City:
“ Dear Sir : — Replying- to your favor of the 14th, permit me to say that the question is, not what you consider I am entitled to, but what I am, as a matter of fact and under our agreement entitled; and it is upon, the agreement, with the purchase and the evidence in my possession,, that I claim my quota resulting- from the Perrier scrip. I shall not go, into the question of whether or not you are in the habit of disputing, your promises. You certainly have not carried out your agreement with me with reference to the Perrier scrip; and, again, I repeat what I said in my former letter: that I should dislike to have any controversy with you resulting from our business relations; but unless the matter is-, adjusted by Tuesday, I shall take such proceedings as I am advised are necessary to'enforce my legal rights.
“ Yours very truly,
“ (Signed) Henry L. Lazarus.”
“ G. 1.”
Defendant's Reply.
“ Isidore Newman, Sr.,
“ Banker & Broker,
“P. O. Box 117.
“ New Orleans, March 18th, 1899.
“ Mr. IT. L. Lazarus, City:
“ Dear Sir : — I beg to acknowledge receipt of yours of the 17th inst., and emphatically deny owing you anything at all. I cannot, however,, prevent you from entering suit, if you are so disposed.
“ Yours truly,
“ Isidore Newman, Sr.”'
*1978 “H. 1."
Plaintiff's Reply.
“ Maroi-i 21st, 1899.
‘“Isidore Newman, Esq., City:
“ Dear Sir : — Insisting upon my right to my quota resulting from the Perrier scrip, and with the correspondence before me, to avoid, if possible, a resort to the courts; if you desire to do what is fair and proper, I propose that our differences be submitted to the arbitration of two disinterested gentlemen, you to select one, and I to select one; and in the •event of disagreement between the two, they to select a third; the question to be submitted to be properly formulated, and the decision to be ■final. Trusting that the matter can be thus amicably adjusted, and -awaiting your reply, I remain,
“ Yours very truly,
“ (Signed) Henry L. Lazarus.”
“ I 1.” ■
Defendant’s Reply.
'“Isidore Newman, Sr.,
“Banker & Broker,
“ Logic Box 117.
“ New Orleans, March 22nd, 1899.
'“ Mr. PI. L. Lazrus, City:
“Dear Sir: — Yours,of the 21st inst. is received. The advice in yours of the 11th inst.: “To consult my attorney,” and the information in yours of the 17th instant: “ That you would take legal steps on the '21st instant,” caused me to employ an attorney, hence I cannot enteritain the proposition in yours of the 21st instant.
“ Yours truly,
“ Isidore Newman, Sr.”
Counsel for the plaintiff attracts attention to the fact, that in the statement rendered by the defendant to the plaintiff, of date March 6th, *1979 1899, no mention is made of the Perrier Ereres scrip — same being confined to the Sulzbacher scrip, and one or two other items of smaller .amount.
He, also, invites attention to the fact that no mention is made in the receipt of any particular scrip transaction — insisting that the receipt was executed at the same time the defendant’s statement was delivered; and that the proof discloses that the transactions were simultaneous.
In his first letter plaintiff states that he first approached the defendant in the early part of April, 1898, with reference to the purchase of said .scrip; and that this interview occurred before the Constitutional ordinance had been adopted adj usting the floating indebtedness of the city.
That, in that conversation he informed the defendant of the existence -of the Perrier Ereres scrip, and that it was in the hands of Mr. Chalaron; and of the Suzbacher & Company scrip which was held by Maurice Stern. That he advised the defendant that same could be purchased at a reasonable figure; and that if the ordinance was successfully passed through the convention, it would pay from sixty-five to seventy cents on the dollar.
That, thereupon, the arrangement mentioned was consummated. 'That the defendant informed him upon the same day that he had pur•chased the Sulzbacher scrip from Stern and the Perrier scrip on the following day.
That about two weeks before date of Letter D. 1, he called on the defendant in reference to the matter, and he, for the first time, assumed the position that he (plaintiff) was not interested in the purchase of the Perrier Ereres scrip, but was entitled to. a share in the Sulzbacher scrip.
The further statement of the letter is, that he demurred to this statement of the defendant, and says: “ I have from your office a memorandum showing not only the Stern scrip held by you, but also the particular scrip purchased from Perrier Ereres through Chalaron ” — evi-deritly referring to the original statement, headed: “City Time,” A. 1, which emana ted from the banking house of the defendant.
The letter contains this further statement:
“ As your lawyer will tell you, a receipt is open to explanation; and as the Perrier scrip has not been accounted for, I claim my interest therein. You certainly bought none of that scrip prior to -the con vernation I had with you; and your books, as well as the cablegrams and ■ correspondence with Chalaron, will show the fact. The-agreement as to *1980 my percentage is made perfectly plain and clear by your account to me, allowing me one-third, and the payment therefor by your check on the Union Bank.”
In reply, the defendant merely reiterates his previous statement. -His subsequent letter emphatically denies owing plaintiff anything.
The grounds upon which the plaintiff demanded a new trial are, substantially, as follows:—
1. That the verdict of the jury is contrary to law and evidence.
2. That the jury erred in finding that the contract sued upon was not fully proven by the evidence, as in any event said contract was admitted by the defendant by his plea of payment, discharge, accord or satisfaction found in the answer.
3. That there was a total failure of the defendant to establish the payment and discharge from the libility sued upon here, plead in his answer; that the receipt and so-called setttlement offered in evidence by defendant to support said plea, was no release or discharge of the sum sued for herein, or the liability sought to be enforced by this suit, and resulting from the contract sued upon; that said receipt was not given or intended to be a release from any liability arising from the cause of action in this suit; nor, in any event, could it be so construed since-there was no consideration received by plaintiff for any relinquishment or release of any claim or right sought to be enforced herein.
It is contended on the part of the defendant, that1 the receipt was not set up as evidencing a payment pure and simple, but that it was to-be taken in connection with the general and special denial of any indebtedness set up in the' answer.
We understand from this, that the defendant first denied any indebtedness as alleged in the petition; and then set up the receipt as an evidence of payment of all indebtedness which existed under their agreement; and, on the other hand, the contention of the plaintiff is, that the receipt covers nothing but the settlement of 'other scrip than the-Perrier Freres scrip, and that he is not-concluded, for that reason, from setting up a claim therefor.
I-Iis further contention is, that the relinquishment in favor of the defendant, which is recited in the receipt, can have no effect — if such was. its latent intention and purpose — in respect to 'the Perrier Freres scrip,, because same is not mentioned therein, and there is no consideration therefor either expressed or implied.
*1981 It is -unquestionably true as a general proposition, that a receipt for the payment of money is open to explanation by parol proof; and that the relinquishment of a right not expressly covered by the receipt, and without any consideration stated therefor, cannot 'be regarded as having conveyed any title which would exclude parol proof.
Taking a comprehensive view of the petition, answer and annexed documents, there is for consideration and decision but one question, and that is, as to whether or not the Perrier Ereres scrip was contefmplated by or included in the agreement between the parties.
The contention on the part of the plaintiff is, that said scrip was included in the agreement; while the contention of the defenda¡nt is, that it was not included.
There is no controversy, and c'an be no ground for dispute, that there was an agreement between the plaintiff and the defendant in the early part of April, 1898, with regard' to the scrip transaction. It is admitted by both parties that, in the course of an interview between them, about the time that the defendant rendered a statement to the plaintiff, B. 1, and on the day upon which the plaintiff signed the receipt, C. 1, dated March 9th, 1899, there was some discussion in regard to plaintiff’s claim for his payment of the profits on the Perrier Freres scrip — plaintiff affirming, and defendant denying the right.
The plaintiff’s petition, as well as averment, is, that he signed the receipt after reflection, and with a view to the principle of law, that a receipt for money was open to explanation; and that in his view the receipt, worded as it was, must be construed with the statement, B. 1, which was submitted to him by the defendant at the same time; and that as the statement .contained no reference to the Perrier Freres scrip, and no mention was made of it in the receipt, that he could not be concluded from asserting his interest in that scrip by any mere recitals in the receipt.
We think it was the evident intention of the defendant to conclude the plaintiff by the terms of the receipt; and that it was the appreciation of the plaintiff in signing the receipt, that he would not be concluded from asserting his claim to the Perrier Freres scrip, because it was not mentioned either in the receipt or statement; and, further, that the relinquishment of any right which is mentioned in the receipt, could have no effect, because the right was not specifically described, and no consideration was expressed or given.
*1982 It is unquestionably true; and not denied by the defendant, that he acquired the ownership of the Perrier' Ereres scrip simultaneously, or very nearly so, with the submission of plaintiff’s proposition to him, and his acceptance of it; and while his answer avows that he had acquired the ownership of that particular scrip before the agreement was entered into, it is not averred, or attempted to be shown, that he possessed any information upon the subject of the possible action of the convention prior to his agreement with the plaintiff, other than that he received from him.
On this disputed question, the-following is a summary of the substantial facts disclosed by the record — both parties having adduced parol proof pro ei con. for the purpose of enabling the court and jury to satisfactorily solve the doubt in their statement:—
Mr. Newman, the defendant, was introduced as a witness on behalf of the plaintiff, and from his interrogation, we make the following extract, viz
“ Q. Mr. Newman, will you please state to the jury in your own way, first, without my questioning you, everything you know about this transaction between yourself and Judge Lazarus, out of which this suit grows ?
“ A. Yes, sir; I will give a full history of it as well as I know how.
* * * * * * -x- *
“ While looking for him, Judge Lazarus steps up to me, unsolicitedly, without my speaking to him, or without looking for him. He says: ‘ You will excuse me.’ He says: ‘ What are you doing here ? I know what you are here for; you are here on that scrip. You want to see Sidney’ — meaning Sidney March, my bookkeeper. I said: ‘You are very much mistaken, sir. I come around to see Judge Monroe, and he isn’t here.’ He says: ‘ By the way, I can show you where you can make some money; I can tell you where you can find some of that scrip.’ I said: ‘ I didn’t come around for that purpose, but if you can show me where I can make some money, I am ready for it.’ He says: ‘ Messrs. Lehman, Stem & Company have some scrip for sale; it belongs to a party in Paris, and if you go there, you can get it.’ He says: ‘ Now, what are you going to do for me if you get it ?’ I says: ‘ Just leave that to me. I will do what is right.’ I went around to Mr. Stern’s immediately, without going to my office to secure the scrip. I asked him if it was for sale. He says: ‘ Yes, it is for sale.’ He asked me: ‘ What will *1983 you give for it ? ’ I says: ‘ I will give you thirty cents.’ He says: ‘ L ought to get more.’ I says: ‘No, it is my price.’ He says: ‘I will, sumbit. It — it doesn’t belong to us; and, if it is accepted, I will give it. to you; but I think you are going to make considerable money out of it.f I says: ‘ I am taking my chances. I may make nothing on it; but if the Constitutional Convention provides for it, I will make a good profit.’ I says: ‘ I will tell you the truth, you can keep or sell it.’ He says:. ‘ You can keep the scrip until to-morrow, and in case I will get an answer, it is yours.” That was all that passed. A few days afterwards,, Judge Lazarus called around at my office, and asked me how I got. along. I says: ‘ I got along very well. I got it.’ He says: ‘ You did?. I am very glad to hear it.’
“ The Constitutional Convention then by ordinance, or the committee-had reported; and the matter looked very much better, of course, after they reported favorably, to do something. Judge Lazarus then said tome: ‘Now, Mr. Newman, I know of some more scrips. We can make-a good deal of money out of it. What are you going to do for mo ?! L said: ‘Judge Lazarus, I want you to distinctly understand; don’t you recommend to me the Union National Bank, the so-called Perrier scrip. I secured that when I first ascertained that the Constitutional Convention would give the matter any -attention, which was some days ago.. Now, don’t you speak to me about the Perrier scrip. I don’t want you to mention that.- Any other scrip that you can mention to me, if I can secure it, I will give you an interest in it.’ He said: ‘ Well, I know of several lots. Moore, Hyams & Company have a lot, and Mr. Bruenn has a lot, and I know of several other lots. And what are you going to-do for me?’ I said: ‘Now, I can afford to pay you more since it is a certainty almost that the Convention will pass an ordinance. I will allow you one-third of the profit.’ I, however, didn’t agree to pay one-third profit in the Perrier matter. It was then in a state of uncertainty. It was, so to say, a lottery, and I take my chances in buying-scrips or floating indebtedness of the State or city. When I mentioned to him, ‘ Now, Judge Lazarus, I want you to distinctly understand not to mention the Perrier scrip to me, for I secured that long ago.’ He says: ‘I don’t claim anything on that; that’s all right; if I had the money I would have bought it long ago. I knew it was for sale.’ Then afterwards he went to work about the Bruenn scrip and the Moore,. Hyams, which he didn’t secure, but afterwards, he secured another lot during my absence duripg the summer last year when I was gone. It *1984 was only a small amount, a few hundred dollars. I don’t remember • exactly how much. I guess the books will show. After I returned from my trip from California, Judge Lazarus — after I had funded all the scrip — Judge Lazarus called at my office, remained there about three-quarters of an hour, and spoke to me in this manner. He says: ■‘ Well, Mr. Newman, are you ready to settle ? ’ I says: ‘ Why, certainly, ■ of course I am, and I am always ready to settle what I owe.’ He says: ‘ Well, how much do you owe me ? ’ I says: ‘ I owe you for the Stern, or •Sulzbacher scrip, and I owe you for some other scrip that you brought into my office during my absence. I am ready to settle.’
“ ‘ Oh, you owe me something more.’ I says: ‘ If I owe it, I will pay it. What have you reference to.’ He said, in a very mild manner; he .says: 'You owe me for that Perrier scrip.’ I said: ‘Judge, you don’t mean what you say. Judge, did I agree to give you an interest in the Perrier scrip ? ’ I spoke it in this manner, in an emphatic manner. ' I -certainly did not,’ ‘Yes you did,’ he said quietly. I said: ‘Judge Lazftrus, refresh your memory. Did I not caution you when you came to my office and said you knew of several other scrip, not to mention the Perrier, or Union National Bank scrip, which is all the same; did I not ■tell you not to do it? -xlnd now you want to come and claim this? I .am surprised. I didn’t know you were that kind of a man.’ I furthermore stated to him: ‘Judge Lazarus, you know as well as anybody else here in New Orleans, that knows anything about the affairs of the Union National Bank, that I know all about the Union National Bank — unfortunately, I have lost money there, but I knew the scrip was for sale for the last fifteen years, because Mr. Carl Cohn tallied to me .-.about the scrip, to make him an offer as a personal favor, because, he .says, ‘ I was the unfortunate man that recommended Perrier Freres to .advance money on this scrip,’, and he showed me letters every year or so' where those people wanted to sell it for almost anything.
“ I says: ‘ No; whenever the time comes, I can make you an offer for the scrip, I will do so. I will not buy it now. I don’t consider it to be .good, legal security for the time being, unless some provision is made for 'it. Whenever that is made, I will make you a bid for it.’
“ Mr. Chalaron repeatedly afterwards asked me to make him a bid for this scrip. He said: ‘ I am getting letters from Perrier Brothers; make me a bid; I want to get rid of it; make me a bid,’ and I wouldn’t do it. I believe that everybody that knows me, knows I am well informed on the floating indebtedness-of the State and city. • It is one of my special *1985 ties. The moment I heard this matter mentioned, the first time I went to Mr. Chalaron. I said: ‘Mr. Chalaron, is that scrip for sale yet?’ He says: ‘Yes.’ I says: ‘I want to make a bid for it.’ ‘What will you pay?’ he asked. ‘ I will give you thirty cents.’ He says: ‘Leave .this open until I cable to France.’ I says: ‘ Yes; I want it understood if the cable comes back to sell it, I want to get it; but, if the security is worth more than I am paying for it, I don’t want .it.’ He says: ‘ Yes; that is very business-like.’ I says: ‘ I wouldn’t be guilty of doing anything else.’
“ The following morning, he showed me the cable and says: ‘The scrip is yours.’ ‘ Send it over.’ He says: ‘ I can’t deliver it to you, the :scrip is away; the people have to send it.’ I says: ‘ It don’t make any •difference; deliver it when you please.’ I bought it with that understanding; I was not to wait until it came.
“ Now, I will refer back to the presence of Judge Lazarus when he was at my office. Before he left my office, Judge Lazarus never said much. He said only a few words — ‘ You are mistaken, you axe mistaken, you are mistaken, Mr. Newman.’ I said: ‘ I am not mistaken; I •am emphatic about it; I know what I am saying, and you know it too; you ought to know,’ and he says: ‘ You are mistaken, you are mistaken, you are mistaken.’ That’s all I got out of Judge Lazarus. The matter had to come to a conclusion. I was not going to stay long with him in an unpleasant conversation like that. I says, ‘ What are you going to do ?’ I says: ‘If you think you can recover anything out of it, or get .•anything out of this Perrier scrip, I want you to understand emphatically I will never give you a solitary cent. You might as well go and institute proceedings. You will never get a dollar out of it. I am emphatic and determined about that. Whatever you get in court, I will ¡pay.’
“He said: ‘Then I will tell you what you do; make me out a statement; let me see how the statement looks, and what is coming to me.’ I said: ‘ I will do so.’ I was short of a bookkeeper then, and it took me several days to-make out a statement. After I had it ready, T telephoned Judge Lazarus. Judge Lazarus sent several times to my office. L said to please excuse me; I am short of a bookkeeper, and I will be ready in a few days; and when I had it ready, I telephoned that I was prepared to submit the statement to him. Judge Lazarus called at my office. 4 He says: ‘ You are ready for me ? ’ I said: ‘ Yes, Judge Laza *1986 rus, -here is the account. I have made it out of what is comih'g to you.Please look at it, examine it.’ He took the account-Please give m¿ that paper. I want to show how it was done exactly, Judge. • I said: - ‘ Judge Lazarus, here is the statement of this transaction; please read it over and exámine it, and see if you find it correct.’ He read it over carefully, and said: ' Yes; I find it is correct.’ I said :• ‘ Well, if this is-correct, Judge Lazarus, please sign this receipt, read the receipt and sign it.’ He took the receipt and read it very carefully, word for word. He says: 'Yes; this is satisfactory,’ and signed the receipt. I said to-my young man, one of my young men: ' Albert, please give the Judge a check.’ He handed him the check,' and Judge Lazarus accepted the check. I said: 'Well, Judge, after all you did very well; you made-nearly twelve hundred dollars out of this transaction; you had no risk and you had no trouble in this matter.’ He says: ‘ I did much better-with others. I made a great deal out of it; I made thirteen thousand dollars out of this scrip with other people.’ I said: ' I am very glad of it.’ That was all of it. He then left. That was all, except the correspondence which took place, which speaks for itself. I have given-you a full statement. I' can’t say anything more of it. • I wish to be-cross-examined. I wish to say, gentlemen, in all my business career,. I have never had-any difficulties of that kind; ánd I feel it a good deal. I don’t want to come to court; don’t like court.”
■ In the. course' of the interrogation of the defendant, he- made the following explanation of the statement A. 1:
“ Q. You say that this statement is in the handwriting of your bookkeeper ?
“A. Yes, sir.
“ Q. Is it within your knowledge whether he made the statement under anybody’s instructions?
“ A. I couldn’t tell you. I was not here.
" Q. You know nothing, then, of the circumstances under which this-statement was made and delivered to Judge Lazarus?
“A. No, sir; I couldn’t tell you.
''Q. Could you explain why it is if Judge Lazarus was not interested in the.-,Perrier scrip- he should have been rendered, or given by your bookkeeper from your office, a statement which includes the Perrier scrip, whiqh you deny his having any interest in, alongsidé 'of the Sulzbacher scrip, which you- admit he was interested in. How would that be?
*1987 “ A. Please repeat that.
“ Q. Can you explain why it is if Judge Lazarus had no interest in the Perrier scrip, he should have been furnished by your bookkeeper with a statement, along with the Sulzbacher scrip, which he was interested in, a full statement of tire Perrier scrip ?
“ A. I will answer your question. I cannot. I was not here at the time. I can only say that any bookkeepers, Mr. March and Mr. Simon, can explain. Mr. March told me — ■
“ Q. Never mind what Mr. March told you.
“ A. Mr. March and my two bookkeepers will explain that.
“ Q. Then, I understand you to say that you cannot explain the presence of the Perrier scrip along with the Sulzbacher scrip upon this state-, ment ?
“ A. I can’t explain this statement. I was not here at the time. I didn’t make it out. How could I?
“ Q. Whatever the reason might be, you have no explanation to offer ?
“ A. No, sir; I leave that to my bookkeeper.
“ Q. Now, ordinarily, what would be indicated by the presence of this Perrier scrip upon a statement rendered to Judge Lazarus if he was—
By Counsel: “ That is what the jury is here to find out.”
By Counsel:
“ Q. The way you do your business, the presence of the Perrier scrip on this statement would indicate what — that Judge Lazarus was interested in it, or that he was not interested in it %
“ A. I don’t know what it was given for. How can I tell you ? I can’t tell you that.
“ Q. You are speaking about this particular statement.
“A. Yes, sir.
!< Q. I am not. I ask you if you had made this statement yourself, would it indicate that Judge Lazarus was or was not interested in the business figuring on the statement ?
“ A. I was not here at the time. I can’t tell you what it was given for. Judge Lazarus.might have come to me and said: ‘How much scrip did you own?’ and I might'have told him,so much. •
“ Q. You think I am asking you about this particular statement ?
“A. Yes, sir.
*1988 “ Q. Well, I anx not. If you had made this statement yourself, which I understand you to say you did not, and rendered it to Judge Lazarus, the presence of that Perrier scrip in the statement would indicate what?
“ A. Nothing.
“ Q. It would indicate nothing ?
“ A. Nothing at all.
“ Q. The statement, then, that you would render, would mean nothing at all?
“ A. Wouldn’t mean anything. I have often had lawyers to come to me and ask me: ‘ Mr. Newman, how many coupons or bonds have you got ? ’ I have given them that. I have, done that with different 'lawyers. Mrs. McCaleb would often say, have you any coupons of such and such bonds ? ”
* * «- * * * * *
Again:
“ Q. You sought to obtain the Perrier scrip before you saw Judge Lazarus ?
“A. Yes, sir.
■ “ Q. When was it your purchase of the Sulzbacher scrip was completed and you paid the money for it?
“ A. I have it here; I have the checks for it. The Sulzbacher scrip.
“Q. Yes?
“ A. April the 12th.
“ Q. When did you become the owner and pay for the Perrier Brothers scrip ?
“ A. April 13th.
“ Q. Your negotiations for the Perrier Brothers scrip, though, began before those for the Sulzbacher scrip ?
' “A. They did.
“Q. And resulted in your buying it after you got the” Sulzbacher scrip. You finished "first the one you began last ?
“ A. I secured it, — that is, I contracted for the Perrier scrip before I did the Sulzbacher scrip, though I paid for it one day later than the Sulzbacher, because the scrip was not in town. I had to wait until it was delivered, and I had examined all these bills — there was perhaps fi.y§ or six hundred — and add them up and examine it. It took some tinte.
“Q. Now, Mr. Newman, did you have any conversation about this *1989 matter at all with Judge Lazarus between August 9th, 1898, and the 6th of March, 1899 ?
“ A. Will you tell me when we made the settlement, and I can tell ?
“ Q. The receipt is dated on the 9th of March, 1899.
“ A. Now ask me the question again, please.
“ Q. Did you have any conversation on the subject of the Perrier scrip after the 8th of August, 1898, and before the 6th of March, Í899 ?
“A. Yes, sir.
“ Q. What was it ?
“ A. I have related it here.
“ Q. When did it occur ?
“ A. That occurred several days before I settled with him.
“ Q. You rendered Judge Lazarus a statement of how you and he stood, according to your understanding, on the 6th of March ?
“A. Yes, sir.
“ Q. Why was not the account closed and the settlement made on the 6th of March ?
“ A. Because it took me several days to make out a statement, to find out exactly how much profit there was in it, and, furthermore, I was one bookkeeper short at the time, and I asked Judge Lazarus’ indulgence for a few days, that one of my bookkeepers was absent; to give me a few days.
“ Q. What was there about the matter that required several days to make up a statement composed, of one item ?
“A. One item? Where is the account? You will find there are more items.
“ Q. The Perrier scrip-
“ A. The statement which I furnished Judge Lazarus-•
“ Q. The Sulzbacher scrip, which you understood was all that Judge Lazarus was interested in, was an amount of eight thousand and some ■odd dollars ?
“A. Yes, sir.
“ Q. You paid a certain amount for it?
“A. Yes, sir.
“ Q. You sold it to the city for a certain amount ?
“ A. Yes, sir.
“ Q. In the difference Judge Lazarus was interested one-third ?
“A. Yes, sir.”
*1990 • With reference to the receipt O. 1 the following is a part of the interrogation of the witness, viz:—
“ Q. Now you presented Judge Lazarus with this account on the 9th, although it was completed and made out on the 6th?
“A. Yes, sir.
“ Q. And simultaneously with the account you tendered him a receipt for his signature?
“A. Yes, sir.
“Q. Have you the receipt in your possession ?
“A. Yes, sir; the original.
“ Q. I suppose you want to keep that ?
“A. No; you may keep it here.
“ Q. This receipt was inepared by you before Judge Lazarus came ?
“A. Yes, sir.
“ Q. You didn’t consult him about the wording of the receipt?
. “ A. No, sir; I did not.
“ Q. You considered well and made '.up your mind exactly what kind of receipt you wanted ?
“A. I was very particular in giving the proper receipt, -for after Judge Lazarus claimed an amount to which he was not entitled, I wanted to be sure that I would get a good, legal, valid receipt, and I had it written out by my lawyer.
“Q. You consulted a lawyer between the 4th and 9th?
“ A. I did consult my lawyer as to how to write up that receipt. I wanted to get a good legal receipt.
- “ Q. You had it in your mind, between the 4th, when Judge Lazarus demanded an interest in the Perrier scrip, to take from him in the end some kind of acquittance that would cut him off from that claim ?
“ A. Out him off' from any claim he was not entitled to.
“ Q. I understand, that is your way of looking at it; but what you wished to do was to get a discharge, or a release from him of any claim against the Perrier scrip?
“A. Yes, sir.
“ Q. That is what you intended ?
“ A. Yes, sir.
“ Q. And with that in view, you had this receipt framed under legal advice ?
“A. Yes, sir.
“Q. Did you explain to Judge Lazarus, in seeking to obtain his sig *1991 nature to that paper, that your design was to cut him off from any claim or right that he might have in the Perrier scrip matter ?
“A. No, sir. I thought the Judge was a lawyer, and-he ought to know his business, and I wanted him to read it, and asked him was it satisfactory, this receipt, and I said, ‘ Please sign it, and I will hand .you a check,’ and the young man handed a check to Judge Lazarus.
“ Q. Tou didn’t inform him that the object of the receipt was to obtain a release from the claim that he had made on the 4th of an interest in the Perrier matter; ^you didn’t tell him that ?
“ A. When he signed the receipt — of course, he is a lawyer — he read the receipt; knew what he was signing.
“ Q. Tou thought his business Was to take care of himself?
“ A. I thought he was able to do it.
■“ Q. Tou didn’t feel under any obligation to assist him?
“ A. That was not my business, that was his.
“Q. Tour business was the reverse of that?
“A. Reverse? I didn’t reverse it.
“ Q. Not to take care of him ?
“ A. He was able to take care of himself. He is a lawyer and I am mot.
“ A. And if you couldn’t, you didn’t feel any responsibility about it ?
“A. No, sir; I did not. I am no. philanthropist in that respect.
“ Q. Tou offered the receipt to Judge Lazarus for signature at the same time you showed him the account?
“ A. No, sir; I offered it to him after showing him the account. I Landed him the account and said: ‘ Judge, here is the account in which .you have an interest. Look it over and see if it is correct.’ He read it all over, and said: ‘ Tes, that is correct.’ I said: ‘ Now, here is a receipt; please sign it; read it over and sign it.’ He read it over carefully. I said: ‘ Is this satisfactory, Judge?’ He said: ‘ Tes.’ I said: ‘Albert’ — to my young man — ‘please write out a cheek,’ signed the check, handed it to Judge Lazarus, and I said: ‘ Judge, after all, you did very well in this business. Tou had nothing to lose.’ He said: ‘ I did better with others.’ He says: ‘ I made thirteen thousand dollars with the other people; I made much more out of them than you. I made thirteen thousand dollars.
“ Q. Tou offered him the account for examination.
“A. Tes, sir; I did.
“ Q. And when he examined it, you tendered him the receipt ?
*1992 “A. No, sir; I asked him if the account was correct, and he said yes..
“ Q. And then you gave him the receipt?'
“A. Yes, sir; and I told him to read it over, -and 'he read it over. After reading it over, I told my young man to write out a check, and the- • check was handed to Judge Lazarus, and there was nothing more said.
“-Q. Was' it your pourp'ose to obtain from him a release from some.- ' thing else besides the'account which he came there to settle?
'‘'A. I wanted a receipt in full, so he couldn’t claim anything more-that he did claim from me.
• “ Q. Your intention was to settle something besides the account which he came there to examine ?
“ A. I wanted to make a full settlement. The receipt shows for itself.
“ Q. Now, this receipt closes with these words: 'I relinguish in his. favor my right, title and interest’- — What right, what title and what interest was there being relinquished by those words ?
“ A. Finish it. I can’t tell.
“ Q. Declaring this to be a full settlement of my interest in the said affair.’
“ A. In all the city time affair, all the transactions we had, in toto.
“ Q. You understood, then, that he did have a right, a title and an interest which he could reliqnish to you?
“A. Yes, sir; he had a right.
“ Q. And you intended to obtain a relinquishing?
“A. Yes, sir.
“ Q. Your idea was not that he should surrender to you a right he-did not have, or a title he did not possess, or an interest he did not win ?
“A. My intention was that he should malm no more claim in any city time investment.
“ Q. And for that relinquishment of anything else he may have had,, you paid him simply the eleven hundred odd dollars which was due him,, as you understood it, on this account ?
“A. Yes, sir; or any other account, as far as city time is concerned.
“ Q. But for what you owed under this statement, as you understood it, yoii wished also to acquire any other thing he might have outside of this account ?
“ A. This eleven hundred and sixteen dollars was a full acquittance of all claims he should have on city time.
“ Q.. 1 Whether stated on this account or not?
*1993 “ A. There was nothing to be stated.
“ Q. You would owe him, according to your theory, eleven hundred, and sixteen dollars on this account, whether he had an interest in anything else or not?
“ A. I owed him in full settlement, eleven hundred and sixteen dollars.
“ Q. Whether he ever heard of the Perrier scrip or not ?
“A. That was discussed.
“ Q. So that by paying him what you owed him about the Sulzbacher • scrip, you wanted to get rid of anything else ?
“A. I ought to know what I owed him.
“Q. What is the meaning- of this relinquishment of yours; that he-relinquishes his right, title or interest, if he had no right, title or-'interest ?
“A. Right, title and interest in all scrip transactions between us.
“Q. And you had distinctly ill mind the Perrier scrip?
“A. Any and all scrip.
“Q. Was there any other scrip except the Perrier scrip?
“A. Yes, sir; there was that judgment scrip.
“Q. There was no dispute about that judgment scrip, seven hundred^ odd dollars ?
“A. No, sir.
“Q. That has nothing to do With this now, really has it ?
“A. It is in that account.
“Q. Now it becomes a matter of difference and discussion between-yourself and Judge Lazarus on Saturday, the 4th of March, whether he-was concerned in the Perrier Brothers scrip at all ?
“A. Yes, sir.
“Q. You prepared on the 6th a statement, which has been offered ini evidence here, and on the 9th of March you made a settlement?
“A. Yes, sir.
“Q. So that between the 4th and the 9th you were preparing to make-a settlement ?
“A. Yes, sir.
By á Juror:
“Q. Mr. Newman, in making that statement on joint account, was-, it your intention to render him an account of all the profits; and after-he read it and approved it, to make a deduction?
“A. To make a deduction?
*1994 “Q. Yes; of Ms one-third share?
“A, I don’t understand .you exactly.
“Q. Was it your intention of rendering him an account of all ;profits of that city floating debt?
“A, Yes, sir.
“Q. And after, at the time of settlement, to make the deduction, .and allow his one-tMrd ?
“A. Yes, sir.
“Q. Did that show all the profit between you and him?
“A. Yes, sir.
"Q. And you were to deduct at the time of settlement and give him ■one-third ?
“A. Yes, sir; that is correct.
“Q. What was the object of making- a statement of that kind, nothing showing that that statement was a joint account?
“A. Well, we merely give it a name, that’s all, to show the trans.action of the scrip; that’s all. We couldn’t tell any other way.' I didn’t want to say 'Isidore Newman,’ so I said ‘II. L. Lazarus,’ which shows there at the heading of it, that he was interested in that amount. I mentioned it ‘II. L. Lazarus,’ so I could tell exactly what he was entitled to, the different scrips.
“Q. This agreement between you two gentlemen, was that a verbal ¡agreement, or a written one?
"A. It was verbal.
“Q. Verbal?
“A. Yes, sir.
“Q. Was any one in your office familiar with this agreement at the -time it was made with Mr. Lázarus? Did you notify Mr. March, the book-keeper? was there anybody in your confidence in-the office, that had any knowledge of that agreement ?
"A. No, sir.”
Again:
“Q. You told Judge Lazarus, however, that you already owned the Perrier scrip ?
“A. I told him only when he said he knew of other scrips; and I •cautioned him not to mention the Perrier scrip, that I had secured that •already; had bought it several days before.
“Q. Fix the date of that conversation ?-
•“A. That was the day I informed him that I had bought the, i$ulz'.bacher scrip.
*1995 “Q. Can you fix that date, as near as you can ?
“A. I guess it was about three or four days afterwards.
“Q. After what?
“A. After I bought the scrip from the Union National Bank; four or five days.
“Q. 1 will have to ask you again to fix, as near- as you can, the date •on which you told Judge Lazarus that you already owned the Perrier scrip ?
“A. About four or five days.
“Q. Four or five days what?
“A. After he told me I could buy the Sulzbacher scrip.
“Q. It was after he told you you could buy the Sulzbacher scrip, •about three or four days—
“A. I don’t say three or four; four or five.
“Q. That you told him you had already owned the Perrier scrip; 'that came up, and he told you three or four days after the Sulzbacher matter was introduced, he knew about the other scrip ?
“A. Yes, sir.
“Q. And you told him promptly not to speak about the Perrier -scrip because you already owned that 2
“A. Yes, sir; in order to avoid any misunderstanding.
“Q. How long had you owned it ?
“A. About three days.
“Q. Now the Sulzbacher matter was introduced by Judge Lazarus-•to you about what date ?
“A. I think it was the Jth.
“Q. Ith or 8th ?
“A. Yth.
“Q. Was it on that same day, or another day that you went to Mr. Stern or offered or began negotiations to buy the Sulzbacher scrip ?
“A. It was the same day.
“Q. The same day ?
“A. Yes, sir.
“Q. Whatever day then that you saw Mr. Stern, whatever that may ■be, that is the same day that Judge Lazarus spoke to you?
“A. Yes, sir.
“Q. And it was three or four days after that, that you informed him that you owned the Perrier Brothers’ scrip ?
*1996 “A. Well it was two or three days afterwards, three or four days; I don’t remember exactly. It was a few days afterwards'.
“Q. A few days afterwards ?
“A. Yes sir; he called at my office.
“Q. That would make it about the 9th, 10th or 11th ?
“A. I suppose so.
“Q. Wouldn’t itf
“A. I suppose so. It would bring it about the 10th.
“Q. When was it that you first approached Mr. Chalaron to buy the-Perrier Brothers’ scrip, on what date ?
“A. I think on the 5th of April.
“Q. You are positive that you went to Mr. Chalaron seeking to buy that scrip?
“A. Yes, sir.
“Q. Before Judge Lazarus-had come to you at all?
“A. Yes sir; I am positive.
“Q. You are sure of that?
“A. Yes, sir.
“Q. And at the first conversation, the conversation at which you admit there was the contract abput the Sulzbacher scrip; the Perrier-Brothers’ scrip was not mentioned?
“A. Please repeat your question.
“Q. In the conversation in which you agreed about the Sulzbacherscrip, the Perrier' scrip was not mentioned-at all?'
“A. It was mentioned by me cautioning Judge Lazarus not to mention it to me. When he told me he knew of other scrips; in order to-avoid unpleasantness, I told Judge Lazarus not to mention the Perrier-scrip.
“Q; Then at that conversation?
“A. He asked me whether I had secured the scrip. I told him I. bought the scrip.
“Q. The-what? .
“A. The Sulzbacher scrip.”
Again:
“Q- You claim you owned the Perrier scrip on the 4th, and yom bought the other on the 6th or 7th ?
-“A. '- Yes, sir.
“Q. And you did that by cablegram ?
“A. ‘ Yes, sir.
*1997 “Q. Can you get a copy of that?
“A. I suppose Mr. Chalaron has it. He is here.
“Q. What induced you to buy. the Perrier scrip a few days before the Sulzbacher? Was it from information received, or the newspapers?
“A. It was from information received. I am well informed about matters that come up about the city floating debt; and the moment I saw there was a chance, that the convention might provide for it — I was not certain it would- — I take the chances — I buy all claims of tihat kind against the city and State — well, I said, ‘Here is a good gamble; I can buy it for about thirty cents; perhaps the Constitutional Convention will order it funded or provide for its payment,’ and I took my chance. I do that a good deal.”
Again:
“Q. Now, Mr. Newman, you are positive that when Mr. Lazarus saw you at the Constitutional Convention, that you had previously made the offer and received the confirmation of the offer from Chalar ron ?
“A. I am positive.
“Q. There can be no question about that in your mind?
“A. None whatever.
“Q. Now, tell us exactly what it was that Mr. Lazarus offered you, what was he to do for you, and what were you to do for him, at this Constitutional Convention conversation, just as briefly as you can. I don’t want any of the details. What did he offer to do for you ?
“A. He offered, if I would remunerate him for it, to tell me where I ■could buy some scrip.
“Q. He was to point out to you the specific pieces of scrip to buy?
“A. And he pointed to the scrip held by Lehman, Stern and Company.
“Q. You went from him, from his presence, to Lehman, Stein and «Company ?
'“A. Direct, without going to my office.
“Q. About how far in squares?
“A. It is about three squares; three or four.
“Q. So that within a very short time after talking to him you had made the proposition to Lehman, Stern and Company ?
“A. Yes sir; I did.
“Q. And the next day it was settled?
“A. Yes, sir.
*1998 “Q. Now, there has been something said about the conversation which occurred when that receipt was presented. Did Judge Lazarus, make any protest against signing that receipt ?
“A. None whatever.
“Q. Did he make any reservation of his rights, whatever they were?"
“A. None whatever.
“Q. Did he claim that you were forcing him to sign that receipt?
“A. No sir.
‘'Q. You were asked by a member of the jury how you came to, know about this scrip. Had you talked to any other person before you talked with Judge Lazarus ?
“A. Which scrip have you reference to ?
“Q. The Perrier scrip ?
“A. I have known it for fifteen years.
. “Q. Had you talked to any one outside of Judge Lazarus about the prospects of settling with the city ?
“A. I spoke to Mr. Gilmore about it.
“Q. Who is Mr. Gilmore?
“A. The city attorney.
“Q. Had you talked with him about the prospects of an adjustment with the City of New Orleans ?
“A.' Yes, sir.
“Q. Did that conversation precede the conversation with Judge Lazarus ?
“A. Yes, sir.
“Q. Was there any doubt of that conversation in your mind?
“A. None whatever, none whatever.
“Q, Now, what did Judge Lazarus do for you in the Perrier Ereres matter ?
“A. Nothing whatsoever, not the least thing.
“Q. Mr. Newman, what is your business ?
“A. I am in the banking and brokerage business.
“Q. You have made a specialty of dealing in city time and city securities ?
“A. What is called city floating indebtedness, city indebtedness.
“Q. You have done that for how many years ?
“A. Well, since I am in the business, 1868.
“Q. You were prominent in reorganizing the Union- Bank after its failure ?
*1999 “A. Yes, sir.
“Q. You were familiar with all its assets and resources?
“A. Yes, sir.
“Q. And you know that this scrip was there under their control?
“A. I knew it for the last fifteen years, at least.
“Q. Then, Mr. Lazarus was to obtain a compensation from you for-putting his finger on any particular piece of scrip you could buy ?
“A. Yes, sir.
“Q. He was to point it out ?
“A. Yes, sir; any piece of scrip he could influence or control for me,, I was to give him one-third of the profit. It had nothing to do with any scrip I held.
“Q. There was agreement of partnership between you and him on scrip ?
“A. No, sir.”
The following is an extract from the testimony of Mr. Chalaron, viz:
“Q. You were approached some time in April, 1898, by Mr. Newman, to buy some city time owned by Perrier Brothers, were you not ?
“A. Yes, sir.
“Q. Was there any method by which you can fix the date on which. Mr. Newman first saw you?
“A. Well, we have some telegrams that I brought down to the court here, which would indicate the date.
“Q. What did you do after Mr. Newman saw you ?
' “A. I sent a cable to Perrier, Masset and Company. That is the-correct name.
“Q. Did you send the cable the same day that Mr. Newman saw you?
“A. I think Mr. Newman saw me on the evening of the 4th, as far as I remember; and after some conversation about this security, he said he would let mo know in the morning, and my recollection is that I sent the cable on the morning- of the 5th.
“Q. What was he to see you about on the morning of the 5th?
“A. I don’t know. He would let me know whether he would make me an offer for the scrip or not.
“Q. There was nothing for you to communicate on the 4th?
“A. Nothing that I know of.
“Q. You sent the cable to your principal on the 5th ?
“A. The morning of the 5th.
*2000 “Q. The cable spoken of, dated Ypril 5th, 1898, reads as follows: ‘Are you still holders of city scrip? liave enquiry, thirty cents.’ You ..received in answer to that — • ?
‘‘A. On the 5th.
“Q. On the 5th of what?
“A. April, in the evening.
“Q. You received an answer to thgt on the 5th of April in the even-ling as follows: ‘Accept thirty.’
“A. Yes, sir.
“Q. What does this mean in hieroglyphics here?
“A. This means $27,464.00, city $crip, and then this means ‘answer immediately.’ ■ <
“Q. The answer is as follows: ‘Accept thirty, $27,464.00 city scrip. Answer immediately.’
“A. Yes', sir.
“Q. Now you sent the cable of yours .some other date. What is -th^.t ?
“A. -That was immediately afterwards, on the night of the 5th, this -one night message.
“Q. On the night of the 5th of April, Mr. Chalaron, you answered .as follows: ‘Closed at thirty. Forward ?’
“A. Yes, sir.
“Q. You received another cable from your principals on the 6th as follows: ‘Hidder, Peabody and Copipany, Boston, will remit scrip ?’
“A. Yes, sir.
“Q. That is all the replies you sent and received?
“A. Yes, sir; all I sent and received.
“Q. Who was the agent of Perrier Brothers — you individually, or Jthe Union National Bank?
“A. They had no agent here. We did formerly business with them.
“Q. Who represented Perrier Brothers about this scrip in any way ■at all — you personally, or the Union National Bank?
“A. Neither the bank nor I. The scrip was in the hands of Hidder, "Peabody and Company, of Boston, where we had sent it after the suspension of the bank in 1896.
“Q. Had you ever offered that security for sale .to anybody?
“A. Not since 1896.
“Q. Did you offer it in 1896, or before 1896 ?
*2001 “A. Before 1896, we endeavored to get an offer for it. We had letters from time to time from Perrier asking us what could be done with ■the scrip, and tried to get an offer.
“Q. Could you do anything with it?
“A. No; we had no offer we could make to them.
“Q. Was there any market for it until the convention passed this measure which is now Article 313 of the Constitution?
“A. I don’t know anything about the scrip after 1896. I never paid any attention to it, and never made any inquiry about it; but prior to Í896, we couldn’t get an offer for it.
“Q. Couldn’t get an offer for it at any price at all?
■“A. At any price, for that amount, of course.
“Q. Did you at any time have the scrip in your possession ?
“A. Yes, sir; up to some time in 1896.
■“By the court:
“Q. Eix the date of the suspension of the bank, Mr. Ohaleron, the Union National Bank?
“A. The 9th of September, 1896.
“By counsel:
■“Q. Do you know how the scrip came originally into the hands of Mr. Carl Cohn, or the Union National Bank for Perrier Ereres?
“A. The scrip was placed in our hands. At the time we were acting as agents of Perrier Ereres. That was in 1890, or prior to 1890, and the. scrip was placed in our hands as collateral security for'Perrier, Masset and Company.
“Q. By whom?
“A. Y. and A. Meyer. They made a loan in Paris, and secured that loan by the deposit of the scrip in the Union National Bank.
“Q. Who was the loan made to ?
“A. To Y. and A. Meyer.
“Q. By Perrier Brothers?
“A. Yes, sir.
“Q. Y. and A. Meyer pledged this scrip to secure the loan?
“A. Yes, sir.”
The following are extracts from the interrogation of the plaintiff in his own behalf:
“Q. Judge Lazarus, you are the plaintiff in this case?
“A. Yes, sir.
*2002 “Q. Will you lease state to the jury the contract under which you bring this suit; when it was made, and what were its terms ?
“A. On the 2nd of April, Saturday, after the committee — the subcommittee of the convention in the matter of the debt ordinance, the committee to whom- the debt ordinance known as 341 of the Constitutional Convention, and now embraced in Article 313 of the Constitution of 1898 was referred, had held a meeting, and they had either adjourned, or taken a recess, or went into executive session, I am not certain which —that committee was composed of Mr. Castleman, Mr. Arthur McGuirk, Mr. Blanchard, Mr. Behrman and Mr. Ewing — I met Mr. Isidore Newman in the corridor of the Convention Hall — .
“By a,Juror:
“Q. On Saturday was that?
“A. Yes sir.
. “Q. April 2nd?
“A. I fix the date as April 2nd, not as any independent recollection, but by reference to the newspaper 'of April the 3rd, for it was at that sitting Mr. Louque made the remark that he would rather eat dirt all of his life.than accept the proposition that was then under consideration. I have the Times-Democrat of April 3rd, which was searched for and handed to me recently the past week, which fixed the date as April 2nd.' ‘Mr. Louque said that as far as he was concerned, he would reject the proposition and eat dirt the rest of his life, rathe!? than to b© treated in that way. Judge Laizarus said that either the debt is just or it is not just. The money for the payment of this debt has been misapplied and diverted. The matter was discussed for some time, without any action being taken, and the committee adjourned until Monday evening, when the hearing will be resumed.’
I met Mr. Newman in the corridor, and I said to him, because our relations at that time, up to that time, and even,now had been very pleasant, and I only approached Mr. Newman in connection with this matter after. I had made .an effort -with two or three others to whom I was referred — I said to him, ‘Isidore, do you want to máke some-money?’. He said,‘always.’ I.said: ‘There is more than a probability of the debt ordinance being passed, which will adjust the status of the floating debt.. Mr. Gilmore has already gone to the extent of two hundred thousand dollars, having advanced on his first proposition, from one hundred and fifty thousand.’ I said: ‘Upon that basis, it will pay from fifty to fifty-five cents. I don’t think that the total debt *2003 exceeds three hundred and forty thousand’ — that was the information that I had at the time from Mr. Clark Steen — ‘but there is a possibility of my raising it to two hundred and fifty thousand; for I am standing for three hundred thousand dollars to retire the floating debt. Haye you any of the scrip? He says': ‘No; I haven’t any, or very little.’ That statement was repeated by him, that he had been out of the scrip for a number of years. I then said to him, ‘Mr. Newman, I know where there are two blocks of that scrip that we can buy, and if we can go in together, we can make some money.’ I don’t' undertake to give the exact words used, but this is the substance of what was said. He says: ‘All right; leave it to me, and I will do what is right.’ I said: ‘That is not business. Let us understand each other at the outset.’ Well, he says: ‘You put up one-half of the money, and I will put up one-half of the money, and we will divide the profit.’ Well, I said: ‘It is not convenient for me, I have some securities,'but wont you do better than that, as I have worked this ordinance in the convention, and I have been interested in the floating debt for a number of years ?’ Well, .he said: ‘I will advance the money. I will charge you interest, and I will allow'you one-third.’ I said, ‘That is satisfactory.’
“Now, I said ‘Perrier Ereres have a batch of scrip here, about thirty 'thousand dollars; Sulzbaeher has ten thousand dollars here in New Orleans. This scrip I had known of for eight years. It was originally • pledged by Y. and A. Meyer to Perrier Ereres' through Carl Cohn representing them, and subsequent to the death of Mr. Cohn, Mr. Chalaron became the agent of Perrier Ereres. There was no market for the scrip, and they could make no disposition of it, and I was satisfied that the scrip was in Perrier Ereres’ possession, or subject to their control. Well, he said, ‘who represents Perrier Ereres ?’ I said, ‘Chalaron.’ He says, ‘That is the Union National Bank?’ He says, ‘I can'do anything ■ I like (that) there; I can get that without any trouble.1’ I says, ‘It is not the Union National Bank, it is Perrier Ereres’ scrip.’ I says, ‘You have got to act promptly in this matter, otherwise you wont be able to get the s'crip; it will become public property, and the valué of the scrip will be changed.’ "He said he would attend to it immediately. I had • no further talk with Mr. Newman for probably a week, when he told me it had been done, or cable messages had been sent, and the'scrip hád 1 been purchased, and purchased at thirty _ cents.'/ That is the history .of the contract between Mr. Newman and myself with reference to the scrip and the interest I had in it.
*2004 “Q. Now you. have heard Mr. Newman’s statement of the rendition of an account of the transaction to you on the 6th of March?
“A. Yes, sir.
“Q. The statement is dated the 6th. Mr. Newman states that it was not presented to you until the 9th.
“A. The afternoon of the 9th, between three and four o’clock.
“Q. Now, had you any conversation with Mr. Newman in regard to the Perrier scrip before the 6th of March?
“A. Yes,- sir.
“Q. Within a recent date ?
“A. Yes, sir.
“Q. When was that ?
“A. On Saturday, the 4th of March.
“Q. Saturday was the 4th?
“A. I fix Saturday as the 4th, because Monday was the 6th, and Thursday was the 9th.
“Q. What passed.between you and Mr. Newman in reference to the Perrier matter on the 4th of March ?
“A. Before urging that, Mr. Miller, will you permit me to state—
“Q. Certainly.
“A. The Sulzbacher scrip was funded October 31st. I repeatedly went to Mr. Newman’s office, and just 'as often was unable to see him. I saw Mr. March on one or two occasions; one I remember distictly, because the conversation took 'place in my office in the presence of Judge I. D. Moore, who was then my partner"; and I said to Mr. March, and I want to say now before Mr. March, that I didn’t believe he knew anything about this scrip business while he was a member of the Constitutional Convention. I have known the young man all his life, I may say, and retain for him the highest regard. I don’t believe he is a gentleman that would obtain any advantage from his position. Mr. March came to the office, and I said: ‘Sidney, why isn’t the Perrier Scrip funded? I am not going to submit to this. The old man is eating me up with his interest.’ He says: ‘I know nothing1 about it. It is a matter he has charge of. I have written to him, and’you better let the matter rest until he returns.’ I said: ‘That’s all very well. Here is a large amount of money drawing interest, and I don’t see why I should be eaten up in that way. I am not the only one interested in this fund, there are others.’ He said: ‘Let it extend over until the old gentleman comes back.’
*2005 “Q. That was—
“A. That was during Mr. Newman’s absence. That conversation took place in the presence of Judge Moore in my office. I don’t know what Mr. March knew about the transaction beyond what I stated to him, and I had repeatedly asked him to see that the Perrier scrip was funded.
“Q. Who was in charge1 of Mr. Newman’s business at the time you had this conversation with Mr. March?
“A. I assume .that Mr. March was. ,
* . * -x- -x- * * *
“I went to Mr. Newman and I said: ‘I need money, Mr. Newman. I wish you would hurry up and get that thing through, doing it as fast as it can be done.’ I had a mortgage note coming due on Thursday, the 9th, held by good people, but people that wanted their money, the interest on a ten thousand dollar note. I went to Mr. Newman on Saturday — I had sent to him frequently, and Saturday I went over to see him, and he invited me info his private office, and I said: ‘Why can’t we have this matter of ours settled up?’ Well, he said he had been very busy with his railroad deals. ‘Now,’ I said, ‘Here, this scrip has been funded since October, and here a week has past and the Perrier scrip is funded, the judgments are funded. We ought to be able to have a settlement.’ He says: ‘You have got no interest in the Perrier scrip. I owned that scrip before you ever spoke to me.
“Q. Right here — Had you ever had any dispute with him about the Perrier scrip up to that time?
“A. Not a word. He says, TTou have got no interest in the Perrier scrip.’ I says: ‘Of course, I have the same interest in the Perrier scrip that I had in the Sulzbacher scrip. They were both purchased on joint account within a day of each other at my suggestion.’ ‘Why,’ he said,‘‘I have known where the Perrier scrip has been all these years; and you think that I, Isidore Newman, a financier here in New Orleans who makes a study of those things, didn’t keep in touch with that?’ I says: ‘That may be all true. You may have known all about it. Others know all about it. You didn’t buy it until I suggested it, and it was embraced in our contract.’ He got up, in a very excited way, and commenced to asseverate. He commenced by saying he would go to the Temple and swear on a bible, and I said whatever doubt I had in my mind, was removed then. I said I must not lose my temper, I must *2006 Seep very quiet, I haven’t a scratch of a pen between Newman and myself—
“Q. I wouldn’t mention what was passing in your mind. What happened between you and Mr. Newman ?
“A. Well, I haden’t any evidence of the contract, it was his word against mine. I said, ‘Mr. Newman, don’t let us discuss that matter; just make up the account as you understanjj it;’ and I left him. He says, ‘I will have that account made up for you on Monday.—
“Q. Judge, one moment. What was your purpose in ceasing at that time any further dispute about the Perrier matter, and asking Mr. Newman to state the account as he claimed it should be stated?
“A. I hadn’t a particle of evidence in my possession. I had nothing but my word as against his to any contract at all. The conversations and the agreements were made between Isidore Newman and myself; I relying entirely upon his word and his commercial honor.
“By a Juror:
“Q. You had a statement that was sent from his office on August 8 th?
“A. That statement on August 8th, by itself means nothing.
'“Q. That was a memorandum showing that the Perrier scrip had been purchased for joint account?
“A. No; it simply shows the amount of Perrier scrip. It shows nothing, Mr. Buckley, beyond figures.
“Q. But the Perrier scrip was included in that amount?
“A. Yes, sir.
“Q. You got this on the 8th of August, 1898 ?
“A. The 8th or 9th. I am not sure of the date.
“Q. This was sent to you?
“A. It was addressed to me.
“Q. Sent to your office ?
“A. Either sent to my office, or delivered to one of my clerks, or possibly it may have been given to me in person. I have no distinct recollection of how I came in possession of it, whether it was handed to me, or sent to me. I say I had nothing on Saturday, except Mr. Newman’s word.
“By Counsel:
“That paper, of the 8th of August don’t set out the terms of any contract?
“A. No sir; neither the measure of.the compensation,, or the interest.
*2007 . “Q. Now you declined any further argument of the Perrier matter at that time ?
• “A. Yes sir; I simply said, ‘Mr. Newman?’ as he said yesterday, in a mild way — I said: ‘Mr. Newman, you are mistaken, you are certainly mistaken.’ I showed no feeling.
“Q. Your interest in the Sulzbaeher matter to the extent of'one-third of the profit was admitted by Mr. Newman ?
“A. On the stand?
“Q. No; at the time you are speaking of now, on the 4th of March— it was adimitted ?
“A. Yes, sir.
“Q. The statement that he would make you would therefore 'have proposed the division of one-third to you, and two-thirds to him of thel profit ?
“A. Yes, sir.
“Q. And to that extent would be a confirmation of your statement ?
“A. Yes, sir.
“Q. Now, you saw Mr. Newraai1 ^01' the first time, after the 4th when ?
“A. On the 9th.
“Q. What passed between you on the 9th ?
“A. I sent to his office on the 6th; I sent to him on the 6th to know whether he was ready to make his statement, and I sent to him in consequence of a letter which I hold in hand from Abe Levy, who is present in court that he demands a settlement of the interest—
* * * * * * *
“Q. Leave out the letter, Judge?
“A. Well, I sent to Mr. Newman’s office on the 6th. Mr. Newman was very busy at that time, as I remember, or rather the answer sent to me was that he was very busy with consummating the Claiborne street and Carrollton Eailroad deal. I don’t think that it went quite into details, but a railroad deal, which referred to those two roads, as I understand it. I sent on the 7th, I sent on the 8th, and I began pressing •on the 9th, because the 9th was the date that I had to pay the mortgage, interest on ten thousand dollars mortgage note, the gentleman that held it was pursuing me. Mr. Newman told me to come over after hours and he would have my statement. I went over there between half-past three and four o’clock. I remember the time because it was *2008 after banking hours I gave my check for the interest after banking hours, with the request that it should not be deposited, as it was drawn against- another cheek, and I didn’t know that the other check would be paid.
“Q. Was there any conversation between you and Mr. Newman beyond your examining the account, and receiving a check for eleven hundred and nineteen dollars on the 9th?
“A. Yes, sir; there was a few remarks made afterwards. I will state exactly what was said. Mr. Newman invited me into his general office. All my previous conversations with him — in fact, I had only one — was in his private office, referring to that settlement. We had a number of private conversations in connection with the ordinance from time to time. He invited me into his general office, and handed me this statement of March 6th. I looked it over carefully, and I said, ‘If your calculations are correct, this accounting is correct.’
* * ' * * * * *
Mr. Newman handed me the account himself. The pencil memorandum was not on it. I looked at the account and the absence of the Perrier scrip. I made no comment, and I said, ‘If the calculations are correct, the accounting is correct.’ He then handed me a typewritten, prepared receipt. I looked at the receipt and I read it, and I read it over carefully. I then took up .the account again; I looked it over; I again read the receipt for the second time, and I said: ‘Well, you want me to sign this ?’ He said, ‘yes;’ and I signed it. He then handed the statement to Sidney — no I don’t think he handed it to Sidney, I think some other young man — and the pencil figures were put on, and he handed me the check for eleven hundred and whatever the amount is, eleven hundred, or eleven hundred and six dollars — I forget now-— eleven hundred and sixteen dollars and fifty-nine cents, on the Union National Bank. That was all that was said; and Mr. Newman’s statement,' that I made the remark when he handed the receipt that that was satisfactory — in that he was mistaken. I did not say it, and I was not satisfied but I accepted the check, knowing that my limited knowledge of the law is that the receipt is open to explanation.
“By Counsel:
“Q. You heard the statement of Mr. Newman, Judge, that on the 9th of March, after you had examined the account and received the cheek, I believe, you stated that it was all satisfactory, or he asked you *2009 whether it was satisfactory, and you answered yes. Did anything of. that kind occur?
“A. Mr. Newman is certainly mistaken.
“Q. You read the receipt thoroughly ?
“A. Yes, sir.
“Q. And understood its meaning before signing it?
“A. Perfectly.
“Q. Did you understand in signing that receipt, that you were to cut yourself off from any right, if you had any, to an interest in the Perrier scrip ?
“A. No, sir.
“Q. Did you understand that the signing of that receipt changed, or had the slightest effect upon the redi situation, whatever it might be,, regarding the Perrier scrip ?
“A. No, sir; any more than I would have taken advantage of Mr. Newman’s account for thirty three hundred dollars, and accepted eleven hundred dollars. The account states that I had earned thirty-three hundred dollars when the truth and fact was I was entitled to only one-third of it.
“Q. Mr. Newman relates yesterday'a conversation which he says, occurred between you and himself in which you approached him after an agreement had been made concerning the Sulzbacher scrip alone,, that you had other scrip which you could bring into this arrangement,, and that he told you before you mentioned any scrip at all that he didn’t wish to hear anything about the Perrier scrip. Did anything of that kind transpire hetween you and Mr. Newman ?
“A. No.
“Q. Nothing at all, no part of it?
“A. No. The Perrier scrip and the Sulzbacher scrip was a matter of agreement at one and the same time. Both lots of scrip I was familiar with. I had knowledge of it since 1890, and had watched that scrip, and knew where it was. The Union National Bank had nothing to’do with it. It belonged to a private banking house in Prance, or private capitalists. I had been to Mr. Bier, Mr. Julius Weis; and the only reason Mr. Weiss didn’t come in, was because he was carrying sixty thousand dollars of that scrip for clients of mine. I had been to Mr. Victor Meyer, even, and knew it was right in the Union Bank, or Chalaron controlled it, although I knew it was away from here at the time.
*2010 “Q. Mr. Newman stated here yesterday that he-understood that you were to buy this scrip from clients of yours. That would have put you in what kind of a position, if you had made an agreement of that kind?
“A. In an absolutely false and unprofessional position, and he could not have understood that, or could not have appreciated what- he said. My clients never sold a dollar of the scrip. I insisted that they hold on to it, and they did, and funded it; and they paid me a very liberal fee. With Siewerd of the Gas Company, I had nothing but his word. Mr. Bier paid me thirteen thousand dollars on his word.
“Q. Was Sulzbacher & Company your clients?
“A. No, sir.
“Q. Were Perrier Brothers your clients?
“A. No, sir; never had any professional relations with either of them.
“Q. Did any of your clients sell their scrip ?
“ A. No, sir; and if I would have done what Mr. Newman stated on yesterday, that I was to induce my clients to sell their scrip for thirty cents, when I knew it would bring from fifty to fifty-five cents, it would have been an act that no- language would have been strong enough to denounce; on the contrary, my clients that held scrip under my advice, held it. Mr. Bier was under the impression that I would get a two hundred thousand dollar appropriation. I told him I would get two hundred and fifty thousand, and to hold on to his scrip.
* * * „ * * * * *
“ Q. Judge, did I understand you to say a while ago that at your first interview with Mr. Newman, on the 3rd of April-
“ A. The 2nd of April.
“ Q- The 2nd of April — at the Convention, at that time the Sulzbacher scrip was mentioned, was it not, and he left there and went around to Mr. Lehman, Stem & Company. . He testified that that conversation occurred?
. “ A. Yes, sir.
“ Q. Do you remember his saying anything about the Sulzbacher scrip at that first meeting at the Convention, when you met him in the rotunda at the hall there?
“ A. When I met him in the rotunda, I was the one who mentioned the scrip.
., “ Q.- You heard Mr. Newman testify that before going to his office he went to Lehman, Stem & Company?
*2011 “ A. Yes, sir.
“ Q. You knew what he went there for, did you not?
“A. I don’t know that he went there.
“ Q. Well, he said that he did go there ?
“ A. Yes, sir.
“ Q. Well, it was in reference to this matter you were discusing at the hall?
“ A. lie didn’t tell me he was going there. He said he was going to the Union Bank.
“ Q. You mentioned a conversation about the following day. At the conversation was the Sulzbacher scrip mentioned?
“ A. The Perrier and the Sulzbacher.
“ Q. At the same time?
“ A. On Saturday, April 2nd ?
“ A. On Saturday, April 2nd. It was after the meeting. The situation was this, Mr. Buckley, Mr. Gilmore, the city attorney, at the opening of the discussion, with a view of fixing an amount for settling the city indebtedness, fixed it at one hundred and fifty thousand dollars. That was his first proposition. He subsequently, after conference with, Mr. Walmsley, agreed to advance the sum to retire the floating debt to two hundred thousand dollars. I represented, with Mr. Louque, over two-thirds of it. We insisted upon three hundred thousand dollars. At this meeting on Saturday, April 2nd, the two hundred thousand dollar discussion took place, when Mr. Louque' pulled his chair away and said he would rather eat dirt all his life than to accept it. At a subsequent meeting, I think either Tuesday or Thursday, Mr. Martin Behrman said that he would settle the difficulty. We insisted on three hundred thousand, and the city attorney was saying that he wouldn’t go beyond two hundred thousand dollars, and Mr. Martin Behrman said that he would cut the Gordion knot and make it two hundred and fifty thousand, and make it two hundred and fifty thousand and report it to the .general committee; but that was not the meeting held the 2nd of April. My present recollection of that meeting is, that it was held on Thursday afternoon.
“ Q. At what hour of the day was it you had the conversation with Mr. Newman at the Convention Hall ?
“ A. Between four and five o’clock.
“ Q. Towards the end of the day?
"A. Yes, sir; the convention was slimly attended on Saturday, and *2012 they adjourned over. The sub-committee had either gone into executive session, or had adjourned when I met Mr. Newman in the corridor of the Convention Hall.
“ Q. In regard to the first meeting that you had on April 2nd, was there any doubt created in your mind at that time that Mr. Newman was unaware of the locality of those Perrier bonds ?
“ A. I don’t think at that time, Mr. Landry, that Mr. Newman had given the matter any thought.
“ Q. Then it was impressed on your mind at that time that Mr. Newman didn’t know where those bonds were?
“ A. At that particular moment, I don’t think he did. I suppose there might have been some time when he did know. He says so.
“ Q. Then from the .tenor of his conversation, he led you to believe he didn’t know where they were?
“A. Yes, sir; it was a new and direct deal.
“ Q. In reference to your receipt, that receipt, as far as it reads, it is all right ?
“ A. As far as it reads it is all right. I acquit him only of this claim.
“ Q. Did you read that receipt before you signed it?
“A. Yes, sir.
Q. You had that statement before you?
“A. Yes, sir.
“Q. You know that there was a statement which entitled you to one-third?
“ A. As far as it went.
“ Q. At the time you signed the receipt, that statement was before you?
“ A. Right at the side of me. That statement gives me thirty-three-hundred dollars.
“ Q. There is an error in that. It is merely a memorandum showing you were entitled to a third of it by an agreement which was not in writing, and that was a statement for you alone ?
“A. Yes, sir.
“ Q. This receipt doesn’t specify any one amount?
“A. Yes, sir.
“ Q. Not the way I read it. It says that you accept eleven hundred’ and sixteen dollars and fifty-nine cents in full payment of all services, claims and demands growing out of the city debt funded into city four *2013 per cent, bonds under Article 313. You must read the receipt in connection with the account. The account was delivered and the receipt signed at one and the same time.
“ Q. ‘I relinguish in his favor all my right, title and interest in the said affair.’ ?
• “ A. Do you know what that would mean ? That I had at that time personally fifteen thousand dollars of the city floating debt. Do you construe that as a donation to Mr. Newman?
“ Q. As I read the receipt; it is different from-
* * * * * * * * *
“ Q. Did you intend by that receipt to settle anything except whatever interest you might have in the Sulzbacher scrip stated in that account?
“ A. That is all.
“ Q. You didn’t intend to settle up anything else?
“A. No, sir; that is all it fairly means. The relinquishment there as suggested means — I had at that time and I have now a very large amount of city scrip, and judgments, one for thirty-five hundred dollars-■
“ Q. That is independent of anything involved here ?
“A. Yes, sir; and I relinquished that, if it is construed in that way. Mr. Newman on yesterday spoke of a threat that he said I made at the interview in his office on March 4th, 1899. He is in error. I made no threat, because I had nothing to go on at that time. I had no evidence of any contract whatever, and immediately after his check was paid, I wrote him my letter of March 11th. I told Mr. Newman that I would take the entire issue of bonds that was to be issued by the Board of Liquidation, two hundred and fifty thousand dollars, to retire the floating debt on the basis of sixty-eight cents. I did it, as a matter of fact, through my clients, induced them to offer to buy the two hundred and fifty thousand at par from the Board of Liquidation, and the proposition was declined.”
Examination arid analysis of the testimony have advanced us but little beyond the statement of the case as it is given in the pleadings— .the plaintiff affirming, and the defendant denying that the Perrier Ereres scrip was included in the original agreement.
The plaintiff affirms that he opened negotiations with the defendant on the subject of purchasing “ city time,” about the 2nd of April, 1898, and particularly mentioned the Ereres block of scrip as being within the *2014 limit of the proposed deal; but, on the other hand, the defendant insists that he acquired the Freres scrip from Mr. Chalaron of the Union Bank, on the 5 th of April, before the plaintiff had proposed the deal on the seventh of that month, and that same was expressly excluded therefrom.
There are some of the circumstances detailed which support the position of the plaintiff, and an' equal number which sustain the position of the defendant.
In this situation of affairs, the defendant’s counsel point to the receipt of the plaintiff as furnishing conclusive proof against him. But we are of a different opinion.
The defendant admits as a witness that there was some, discussion between the plaintiff and himself with regard-to whether or not-the Freres scrip was included in their agreement; and leaving the determination of that question in abeyance for the time being, their conference was not concluded until the defendant could have a statement prepared for submission.
On that account a delay of several days was taken, and in the meanwhile, the defendant consulted his lawyer by whom the -receipt was prepared, and at the next conference, same was presented to the plaintiff for his signature, and it was signed; and, contemporaneously therewith, there was presented to him a statement showing the amount of $3,349.YY due the plaintiff, apparently, while in fact there was actually due thereon only one-third of that sum, $1,116.88. :
That was the statement for which the delay was taken for preparation, and it was for the one-third of that balance that the plaintiff, in terms, executed the receipt.
But. the statement does, not make any reference to the Perrier Freres scrip, .and hence same was necessarily excluded therefrom; but the Sulzbacher. scrip that was purchased by defendant from Lehman, Stem &.Company, and that which had been obtained from Lazarus, were mentioned, and were included therein.
In so far as the further statement that said sum of money -was “in .full payment and settlement of all services, claims and demands grow- . ing out of the City Floating Debt”, is concerned, it must be construed . with reference to the statement and .the items of scrip therein enumerated; and it can not be assumed, that, as between business men, any .covert attempt was made to obtain an undue advantage in the settlement, by any mere subtlety in the form of words that were employed in the receipt.
*2015 While the last sentence thereof is conclusively against that assumption, it does not, in our opinion, add any weight or force to the receipt, on account of same being vague and indefinite.
“I relinquish in his favor all of my right, title 'and interest, declaring this to be a full settlement of all rdy interest in the said affair.”.
If, in point of fact, the plaintiff owned no right, ‘title or interest in the Freres scrip, he certainly did' not) and could not, relinquish any right, title or interest therein. /
And, inasmuch as mention of the Freres scrip was carefully excluded from both the statement and receipt; same can not be reasonably considered as having been included in the “full settlement of all (plaintiff’s) interest,in the said affair.” , , .
Hence, in our opinion, nothing was accomplished by .this, receipt beyond the actual settlement of the scrip account thát was mentioned in the statement that accompanied it. The hiatus was still complete.
The question that was seriously disputed at the beginning — the inclusion vel non of. the Perrier Freres scrip in the agreement — was still left open and undetermined at the end of ‘the settlement.
We feel disposed to attribute the radical difference between the statement of the parties, rather to a difference in their appreciation of what really was their verbal agreement, than to any improper motive.
Hence, in such á ease, the only thing that remains to be done, is to balance the probabilities of a doubtful ease, and decide accordingly.
In the first place, the plaintiff placed the defendant on the stand as his own witness, aiid therefore endorsed him as a credible person and worthy of belief.
. In the second place, the plaintiff • carries the burden- of proof; and was bound to establish his right to share in the profits made on the Perrier Freres scrip by a fair preponderance of proof, but has failed to discharge the same. . . , , , , 5, - •-
In the third place, the cause was tried and decided by a jury who rendered .a verdict in favor of the defendant, and this court will, not set aside a judgment predicated upon the verdict of a jury which depends upon the solution of a close or doubtful state of facts.
In the fourth place, it is .only in clear cases of error, that- this 'court will .set aside the verdict of. a jury in a case involving,-exclusively, a question of fact, after same has received the-sanction and-approval' of the trial, judge. .. .. ,
*2016 Under the law and the evidence, we do not feel authorized to disturb the finding of the jury.
Judgment affirmed.
Rehearing refused.
Blanchard, J.,
takes no part in this decision, not having been present at the argument.